May it please the Court, Counsel, the Fifth Amendment aspects of this appeal concern two interrogations. Together they produced statements upon which the entirety of the government's case rests. First occurred on July 18th, 2023 when Mr. Hayes, recovering from surgery for life-threatening injuries he sustained in a home invasion, was questioned in this hospital bed after a surgery without Miranda warnings and without being told that he could terminate the interview. Second interview August 11th, 2023 occurred at a local police station. There officers disregarded Mr. Hayes repeated requests to leave and pressed him with threats of a murder prosecution. Neither interrogation comported with the resulting statements should have been suppressed. Do you agree the new case controls this case one way or the other? You both cite it all the time. Well I think this case is very fact-specific. Okay well tell me the facts that are different from the new case then. Well in this particular case I assume that you're kind of agreeing with the premise that the new case is still running. Sure. So well we have two distinct interviews here we're looking at. First one in the hospital. First of all it's clear that custody is not an objective inquiry. Physical restraint is highly probative and no single factor is dispositive. This is a total totality of the circumstances situation. And when we apply the Griffin factors to this case, first in the hospital he's not Mirandized. He's told that he can terminate, he's not told that he can terminate the questioning and he was never told that he was free to leave. Of course he was constrained to the hospital bed by IV tubes, oxygen, various monitoring devices and as to that factor the lack of a Miranda advisement strongly favors that he was in no position to ask them to leave. Your Honor, the case law on these issues is clear that custody can exist even without... Were medical personnel in and out, and I'm sorry I really don't know in your case, were medical personnel in and out during the time? Because in new that is a factor. In fact during the interview he rings the nurse a couple times in the new case. Well they were in and out, there were medical personnel that appear in the video, but largely it's the police questioning my client as he's laying in bed. And then the next thing, I'm looking at the facts of new, is that did he ever ask them to end the interview? He did not and same as in new, go ahead. I would just point out he's in a position where he's physically restrained to his hospital bed in the most literal sense. Another thing about this particular interview, it lasted about an hour and 20 minutes and it escalated during the course of that interview from kind of a narrative account to officers pressing him, disbelieving him, and repeatedly pressuring him to change his stories. Now the court, the district court, relied heavily upon the officer's demeanor, but custody, whether he's not in custody or not, it doesn't depend upon hostility. As Miranda, custody can exist even when there's a calm, non-confrontational interrogation. Counselor, this is Jed Smith. Let me ask you, this case comes to us on a conviction from a plea agreement, is that correct? That ultimately a plea and this appeal on removing this evidence is conditional. What are you keeping out? If the evidence, if you were to receive relief today and have suppressed those interviews, what would keep this case from proceeding to trial? Well certainly the government could proceed to trial on the evidence that it has from other aspects of the case. The gun was found in his home. Is it your position that they wouldn't have a case without the hospital interviews? I would say that their case would be substantially weakened. But if they got in the home interviews, what do you think? The home interviews get in but the hospital doesn't? The mill interview, the home interview? Yes. We would have to go that path when we came to it. But that interview, in terms of its subject matter, is not nearly in depth as this hospital interview is, that custodial interview. And I think this case, you know, if he had just been Mirandized in that hospital, we probably wouldn't be here. But he wasn't. But it's not your contention that he didn't know that he had the right to remain silent. Is that accurate? Or is that your contention is that he didn't know? Because the record in this case seems to indicate the defendant has quite extensive experience with the criminal justice system and would certainly be aware of his ability to declare he wants counsel and or declare that he is not willing to speak. Well, the face of his record would certainly suggest that he was a frequent fire with the Sioux City Police Department over the course of many, many years. When you dig down into it, it's riddled with misdemeanor convictions where just reading through the list, it's difficult to say whether he was ever interrogated as a result of any of this conduct or not. I mean, his major conviction, which cost him substantially with respect to the guidelines, was a felony marijuana delivery case from 12 years prior and was the only case where he really even spent any significant amount of time in jail. So how long do you say the interview was? At the hospital. The hospital interview. One twenty? An hour and twenty minutes. Yes. Thank you. So that that's another consideration here is the duration of that and of course the escalating nature of the proceedings. We're not saying that that he was mistreated in any way, but he was definitely pressed. His story was challenged. He's in a very vulnerable situation. Counsel, you're into your rebuttal. You can use it now, of course. I'll wait for my... Sure. Thank you. You may reserve the rest. Mr. Fairchild. May it please the court. Good morning, counsel. My name is Ford Fairchild and I represent the United States in this case. There are four interviews that the court should review when it's coming to its conclusion. Two of which have been complained about. The second at the hospital and the final interview, which takes place at the police station. But there's four. When reviewing those four, you see the interaction and the relationship between the defendant and the law enforcement officers and that will become relevant to your questioning about whether this was voluntary. Let's talk very quickly about the new case, Judge Benton. Yes, it controls. Okay, well there it was only 25 minutes long. When we're talking about the hospital interview, that's a difference. Otherwise, we have similarities. Okay, wait. Another difference is, of course, that they told New he did not have to talk. They said he would not be arrested. He could stop the interview time. He could ask the agent to leave the room at any time. That's not true here, right? It's... What happened here is different, but the context lead one to the same result. Here, during the interview, the defendant is being questioned about his being victimized. So implicit in that is a realization that he can stop talking. Additionally, this is why all four interviews are important. He had previously been visited at the hospital and that interview ended and then this second one conducted the next day, showing that the defendant understood that he had the right to quit this interview. Additionally, during that hospital interview... Did he, on the first interview, stop the interview or did the officers quit questioning, right? I mean, because what it shows is different. If he says, I'm too tired, I don't want to talk to you, that shows, that demonstrates knowledge that he could cut it off at any time. If, on the other hand, doctors walk in and say he's had enough. It was neither of those. It wasn't a specific, I'm done talking, give me a break. Neither was it an interruption by a medical staff. And that's a much weaker inference then. Absolutely. Oh, and to be clear, he did not assert the right, get the hell out of my room. No, that didn't happen. But the fact we have that earlier interview that ends because of his situation shows that he knows that he's... suggests the weaker inference suggests, as the court indicated. In New, however, the kind of principle fact about New that's similar here is that the government didn't coerce or restrain the defendant in this case. In fact, when the defendant in this case became encumbered in his robe, the government freed him from that encumberment. Watch that video. The officers adjust his pillow for crying out loud. There's nothing in here that suggests that he's in custody. Crucially, though he, law enforcement initiate the conversation, they don't tell him he has the right to leave. They don't have, they don't tell him he has the right to stop. All that's accurate. But crucially, during the interview, officers say, maybe we should get out of here or something like that. And he responds, no, no, you're good. So he acquiesces to the conversation. The conversation continues. So in the government's opinion, New does control the Griffin factors, seem straightforward application of the Griffin factors, seems to apply at the hospital, meaning that Miranda wasn't necessary and, of course, it wasn't given. The hospital is a closer call. I lost, or excuse me, the police station is a closer call. I lost that at the district court, but it doesn't matter for this court today because he was Mirandized there. So the question there is just whether or not the statement was voluntary. Of course, you know that a statement is involuntary when it's extracted by threats or promises and it results in the defendant's will being overborn. Two things. We'll start with the overbearing of will first. When you watch these videos, you will see the proof is in the pudding. His will is not overborn. And how do you know it? Because you watch the videos. In particular, the second interview at the hospital and the final interview at the police station, the defendant lies, relents, lies, relents. He's in control. And also has several times to end the interview. Okay, what's his strongest one? What's his strongest, I want to leave, it's time to end the interview. What's his strongest statement? Well, all of his statements are undermined by his physical actions. Yeah, but what's his strongest one, I want to end the interview? Clearest one. I suppose when he says the first time, I want to end the interview. Or I want to go home. Yeah, I'm sorry. He usually says, I want to go home. Go ahead. And crucially important to the court's inquiry, of course, is he doesn't say, I invoke my right to remain silent. Despite the fact that Mr. Smith, as Judge Smith points out, he, or counsel points out, he's a frequent flyer. He knows his rights. He's experienced the criminal justice system. He doesn't say, I invoke my right to remain silent. He says, I want to go home. Well, sure, maybe he wants a pony, too. But that's not the court's question. The court's question is, did he convincingly invoke his right? He didn't. Not even a close call. The words aren't even close. And then the fact that he says he wants to go home is undercut by the fact that he doesn't stand up. He doesn't stop talking. His acts are inconsistent. But I want to go back to the voluntariness issue. The defendant's own behavior on these tapes reveals that he's not being bullied into saying things he doesn't want to or surrendering his rights. And, of course, a man like this isn't going to be bullied by these officers the way that he now claims. He, and it's already been alluded to, as Judge Smith pointed out, this man is made of sterner stuff than he now pretends. He was nearly 40 at the time of the interview. He describes himself as hard and streetwise. He has numerous interactions, both for misdemeanors and felonies. He's been convicted as a juvenile. He's been convicted as an adult. He has numerous additional interactions with law enforcement. The interviewing officer who's present at the beginning of the police station interview and this defendant have known each other for seven years. Frequent flyer, I think my learned colleague said. Boy, that's right. And why does it matter? Because when you watch the videos, you see a frequent flyer, stand up to police inquiry, and you know he is a frequent flyer who is well-experienced with the criminal justice system. That makes an examination of the other factors less important, but it puts it into focus. So let's talk about the degree of cohesion. But before we do that, let's check a few easy boxes for the government. The length of the interrogations. The hospital, about an hour and a half. The second one at the hospital, about an hour and a half. The police station, about an hour and a half. This is far shorter than what this court has encountered in other cases where you've got six or seven hours of detention. So the length of interrogation militates towards the government's position. The location. The hospital, as you discussed, as learned counsel conceded, it's not a police-dominated environment. Medical staff is available there. The hospital, excuse me, the police station is, of course, police-dominated, but his wife is next door and his cell phone is on his person the whole time, making it less police- He's given time to collect himself, to regain his composure. It's not like he is subjected to an hour-long brutal attack of questioning one after another. He's not even being cross-examined by this court. It's just apples and oranges to what this court has seen in other places. And this is not just throat clearing. The government wins because of what you see on the tape, the defendant's character, and those other factors. But let's talk about the nature of the police interaction here. The defendant is urging this court to say that a pure, correct, truthful statement of the officer's purpose and the defendant's predicament is sufficient to be unconstitutionally coercive. That cannot be the answer. These were officers- Counsel, it seems somewhat disputed, as I read it, as to whether just how where they basically try to allay his fears that he's not going to be prosecuted for defending himself. They're not going to try to hang a gun charge on him and give him all of those kinds of assurances and then turn right around and say, we're investigating a homicide. You better tell us the truth. So there's this sense that they could have been trying to lull him into a state of ease, all the while fully intending to interrogate him about killing the individual who died in the event. What the officers say is accurate. They are, in fact, from the Crimes Against Persons Bureau investigating a homicide. That they unearthed these other charges in that process, they're not the dope police. They're not the gun police, just like they say. The fact that they unearthed these other things doesn't mean that they were not telling the truth. Additionally, Your Honor, the proof's in the pudding. The defendant got exactly what he wanted. He provided a bizarre account of what happened. And that bizarre account was then pushed on by law enforcement. Law enforcement indicated that if they understood the full story, he would get the full benefit of the county attorney's rationale on it. That's what happened. He wasn't charged with murder. He wasn't held accountable for the homicide at federal sentencing. He got exactly what he was hoping for in that investigation. By explaining why the gun was at his house, he made it look clearly like a self-defense situation, not a murder. So, while it's disputed, defendant's wrong. The record reveals the officers were telling the truth, defendant is made of firmer stuff than he claims, and even the county attorney is referenced in here. This individual knew he wasn't making charging or plea bargains with the government at that time. Counsel, your time has expired and you have shifted from judging this question. So thank you for your argument. May I have one more moment? You may have one sentence. The procedural issue here warrants the government's victory. Okay, that's the sentence. Thank you. Thank you, counsel. Okay, we're back to Mr. Ramstad. This was a homicide investigation, but in no way, shape, or form did any of the facts of this situation could have led anybody to suspect that a murder occurred here. An individual, unknown to my client, breaks into his house, there's a melee, none of this is disputed, and the intruder ends up dead. I can't resist asking, does Iowa have the so-called castle doctrine, you can defend your home with force once they cross the threshold? Yes, they do. Okay, proceed with your argument. So, the district court relied heavily on this court's opinion in Simpson, but I would submit that Simpson doesn't control this case. Simpson doesn't draw a bright line, and even if it did, Mr. Hayes' conduct simply falls outside that line. He was in this interview room for nearly an hour, maintaining that he did not own this firearm, possess this firearm, but only when law enforcement coerced him, overbore his will by threatening him with a charge that, just under no theory of the facts would have ever been supported, scared him enough to make statements against his interest. The questioning should have stopped when he said, if I'm not being detained, I want to go. And not only did he repeat this multiple times, he attempted, well, he actually ended up leaving the room, and his second effort to leave was blocked by a law enforcement officer saying, oh, we'll just wrap this up, we'll just wrap it up. And that's when they turned up the heat, being threatened with a murder prosecution. Counsel, your time has expired. Thank you. You could have one sentence if you wanted a sentence, since your opponent got a  Threatening someone with a murder prosecution is one step below beating them with a rubber hose. Thank you. Thank you very much. Okay. Case number 25-1649 is submitted for decision by the court. Ms. McKee.